IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83516-5-I |
| Respondent, | DIVISION ONE |
| v. | ORDER DENYING MOTION FOR RECONSIDERATION AND WITHDRAWING AND SUBSTITUTING OPINION |
| JASON DOMINGUEZ, | |
| Appellant. | |

Respondent, the State of Washington, filed a motion to reconsider the opinion filed on January 6, 2025 in the above case. The panel has determined that the motion for reconsideration should be denied. The panel has also determined that the opinion in the above-entitled case filed on January 6, 2025 should be withdrawn and a substitute opinion be filed.

Now, therefore, it is hereby

ORDERED that the opinion filed on January 6, 2025 is withdrawn and a substitute opinion shall be filed.

FOR THE COURT:

_Chung, J._

_Brenner, J_                    _Dwyer, J._

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| JASON DOMINGUEZ,<br><br>Appellant,<br><br>v.<br><br>STATE OF WASHINGTON,<br><br>Respondent. | No. 83516-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Jason Dominguez was convicted of one count of rape of a child in the second degree, one count of rape of a child in the third degree, and one count of communicating with a minor for immoral purposes, all involving H.S., the minor friend of his daughter. He seeks reversal of all three convictions on several bases. He claims missing juror questionnaires deprive him of an appellate record of sufficient completeness and, thus, violate his constitutional right to appeal. He further claims the trial court erred by admitting evidence to show his "lustful disposition" for the victim, allowing the State to amend the information, and including H.S.'s initials in the to-convict instructions. He also challenges statements by the prosecutor as misconduct and a variety of community custody conditions imposed on him. We affirm his convictions. However, we remand to the trial court to replace overbroad language on conditions 21 and 24 and to strike the victim penalty assessment (VPA) and DNA collection fee.

FACTS

Dominguez and H.S. first met while living in Gold Bar, Washington, when H.S. was 11 years old. She was initially introduced to Dominguez and his family because she was in the same Girl Scout troop as Dominguez's daughter.

In 2016 and 2017, when H.S. was aged 11 to 13, H.S. spent increasingly more time with the Dominguez family. During this period, H.S. would spend the night at the Dominguez house three times a month. The family took H.S. to the zoo, the aquarium, and "just different things that [her family] didn't have the money to do." H.S. considered Dominguez to be a "second father."

In mid-2017, H.S.'s mother moved approximately five hours away to Oroville, Washington, but permitted H.S. to stay in Gold Bar with her mother's friend. H.S. then moved to Oroville to join her family, but returned to Gold Bar for visits, which included staying with the Dominguez family.

H.S. first received a cell phone when she was 12, and Dominguez began contacting her shortly thereafter. From 2016 to 2019, the two would talk on the phone and would use Facebook Messenger and Snapchat to communicate. They also used Facebook Messenger to video chat.

In 2019, H.S. accused Dominguez of several incidences of rape, allegedly beginning when she was 13 or 14 years old. In October 2021, a jury convicted Dominguez as charged with rape of a child in the second degree, rape of a child in the third degree, and communication with a minor for immoral purposes. The court sentenced him to a life sentence, with the possibility of release after 170

months. The sentencing court also imposed numerous community custody conditions, the VPA, and a DNA collection fee. Dominguez filed a timely appeal.

In October 2022, Dominguez filed a motion in this court to reverse his convictions and remand for a new trial due to an inadequate record on appeal, specifically, juror questionnaires. His counsel provided a declaration stating the steps she had taken to locate the questionnaires, attesting that Dominguez's trial counsel, the trial prosecutor, Snohomish County clerk, and the trial judge's law clerk all indicated they did not have copies of the completed juror questionnaires. A commissioner of this court denied the motion without prejudice, allowing Dominguez to include argument regarding the adequacy of the record in his merits brief. A panel of this court denied Dominguez's motion to modify.

DISCUSSION

Dominguez challenges his convictions as well as his judgment and sentence on multiple grounds. First, he asserts that because the completed juror questionnaires are missing, he is deprived of a complete record sufficient for review, and thus reversal of all his convictions is required. Second, he argues the court impermissibly allowed evidence into trial solely for the purpose of showing his "lustful disposition," which is no longer a permissible basis for admitting propensity evidence after the Washington Supreme Court's decision in State v. Crossguns, 199 Wn.2d 282, 505 P.3d 529 (2022). Third, he contends the court erred by allowing the State to amend the information after completing its case-in-chief. He additionally argues the use of the victim's initials, rather than her full name, on the jury instructions constituted an improper comment on the evidence.

3

Finally, he argues the State engaged in prosecutorial misconduct during its closing arguments and challenges various community custody conditions.

I.    Juror Questionnaires

Dominguez argues that because the completed juror questionnaires are missing, the appellate record lacks sufficient completeness. He asserts that as a result, his appellate counsel is unable to determine whether the jury was fair and impartial, he cannot identify and fully litigate issues on appeal, and reversal for a new trial is required. In particular, Dominguez claims jury selection was important given his position in the community and the media attention his case received.

Article I, section 22 of the Washington Constitution guarantees the right to appeal a criminal conviction. State v. Waits, 200 Wn.2d 507, 513, 520 P.3d 49 (2022). To pursue an effective appeal, a criminal defendant is "constitutionally entitled to a 'record of sufficient completeness.' " State v. Tilton, 149 Wn.2d 775, 781, 72 P.3d 735 (2003) (quoting State v. Thomas, 70 Wn. App. 296, 298, 852 P.2d 1130 (1993)). However, "[a] 'record of sufficient completeness' does not translate automatically into a complete verbatim transcript." Id. at 781 (quoting Mayer v. City of Chicago, 404 U.S. 189, 194, 92 S. Ct. 410, 30 L. Ed. 2d 372 (1971)). Indeed, "alternative methods are acceptable, provided they permit effective appellate review." Waits, 200 Wn.2d at 513. "Effective review allows counsel to determine which issues to raise on appeal and provides the relevant, equivalent report of the trial record where the alleged issues occurred." Id. "Effective review on appeal also allows for other methods of reporting trial proceedings in instances when a trial court record is deficient or missing." Id. at

513-14. Other methods include " '[a] statement of facts agreed to by both sides, a full narrative statement based perhaps on the trial judge's minutes taken during trial or on the court reporter's untranscribed notes, or a bystander's bill of exceptions might all be adequate substitutes, equally as good as a transcript.' " Id. at 514 (quoting State v. Jackson, 87 Wn.2d 562, 565, 554 P.2d 1347 (1976)). RAP 9.3[1] and RAP 9.4[2] set out possible alternative methods to prepare records of trial proceedings.

Although the "RAPs anticipate that parties will work together to recreate a lost or missing record," the "State bears the burden of reconstructing the record in a criminal appeal." Waits, 200 Wn.2d at 519-20 n.7. Additionally, "[t]he burden of showing that alternatives will suffice for an effective appeal rests with the State." Id. at 514. However, "[a] new trial will seldom be required when a report of

---

[1] RAP 9.3 sets out the parameters for narrative reports:

The party seeking review may prepare a narrative report of proceedings. A party preparing a narrative report must exercise the party's best efforts to include a fair and accurate statement of the occurrences in and evidence introduced in the trial court material to the issues on review. A narrative report should be in the same form as a verbatim report . . . . If any party prepares a verbatim report of proceedings, that report will be used as the report of proceedings for the review. A narrative report of proceedings may be prepared if the court reporter's notes or the electronic recording of the proceeding being reviewed is lost or damaged.

[2] RAP 9.4 controls agreed reports of proceedings and states:

The parties may prepare and sign an agreed report of proceedings setting forth only so many of the facts averred and proved or sought to be proved as are essential to the decision of the issues presented for review. The agreed report of proceedings must include only matters which were actually before the trial court. An agreed report of proceedings should be in the same form as a verbatim report, as provided in rule 9.2(e) and (f). An agreed report of proceedings may be prepared if the court reporter's notes or the electronic recording of the proceeding being reviewed is lost or damaged.

This rule is meant "to allow excerpts from the verbatim report, a narrative report, or some combination of each." Waits, 200 Wn.2d at 515. Additionally, "[t]he agreed report must be submitted to the trial judge under RAP 9.5(b). Id.

proceedings is not recorded or is lost." Tilton, 149 Wn.2d at 785. "In most cases an adequate narrative can be constructed by the attorneys, witnesses, jurors, court attaches or anyone present during the trial." Id. However, when such efforts "are unable to produce a record which satisfactorily recounts the events material to the issues on appeal, the appellate court must order a new trial." Id. at 783.

This court has identified the following factors to consider when reviewing a reconstructed record: (1) whether all or only part of the trial record is missing or reconstructed, (2) the importance of the missing portion to review the issues raised on appeal, (3) the adequacy of the reconstructed record to permit appellate review, and (4) the degree of resultant prejudice from the missing or reconstructed record, if any, to the defendant. State v. Classen, 143 Wn. App. 45, 57, 176 P.3d 582 (2008) (reviewing cases involving sufficiency of reconstructed records and summarizing that "[r]ead together, the pertinent holdings largely depend on [these] factors").

Here, we are not asked to review the sufficiency of a reconstructed record; there is a complete verbatim report of proceedings, including voir dire.[3] Nevertheless, Dominguez argues he has a constitutional right under article I, section 22 of the Washington Constitution to the questionnaires themselves for a record of sufficient completeness to allow effective appellate review.

---

[3] In dicta, the court in Waits noted it could be difficult to reconstruct an adequate record of jury voir dire, pointing to a case in which it recently had heard oral argument involving GR 37 and whether race was a basis for a peremptory strike. 200 Wn.2d at 522 n.8 (citing State v. Tesfasilasye, 200 Wn.2d 345, 518 P.3d 193 (2000)). The Waits court stated, "Review of [that] case involved a granular examination of juror statements for which a transcript was critically important. It is hard to imagine that a narrative or agreed report would be sufficient to allow such a case to come before appellant review." Id.

Though derived from cases involving review of reconstructed records for sufficient completeness, the Classen factors are helpful to consider here as well, as the same question is at the core: whether the record allows for effective review, that is, whether the record "allows counsel to determine which issues to raise on appeal and provides the relevant, equivalent report of the trial record where the alleged issues occurred." Waits, 200 Wn.2d at 513.

Thus, as to the first Classen factor, whether all or only part of the record is missing or reconstructed, here, only the completed juror questionnaires are missing. The questionnaires were not filed with the trial court as part of the record, [4] but there is a complete record of the voir dire proceedings. In addition, the appellate record contains the form juror questionnaire proposed by the State.[5] Along with standard hardship questions, the questionnaire asked prospective jurors if they or any of their close friends or family members had ever been victims of "sexual assault or abuse." It also inquired if the jurors, members of their family, or close friends had "ever been accused of, investigated for, or charged with a sexual assault or sexually motivated offense." The questionnaire

---

[4] The State suggests that unlike the transcript of the voir dire, the completed juror questionnaires were not required to be a part of the record. In support, the State points to State v. Beskurt, a case involving the right to a public trial, in which the Washington Supreme Court held that the questionnaires are not part of the record subject to public disclosure under GR 31(a), which addresses access to court records. 176 Wn.2d 441, 448, 293 P.3d 1159 (2013). The court explained that that a questionnaire is used to assist in jury selection, but "[n]othing suggests the questionnaires substituted for actual oral voir dire. Rather, the answers provided during oral questioning prompted, if at all, the attorneys' for cause challenges, and the trial judge's decisions on those challenges all occurred in open court." Id. at 447. In dicta, the Beskurt court also stated, "We doubt the completed questionnaires in this case qualify as court or trial records." Id. at 448 n.8. However, to address Dominguez's claims, we need not resolve the issue of whether completed juror questionnaires are required to be part of the official record.

[5] The parties submitted an agreed questionnaire to prospective jurors. While the final questionnaire is not in the record, the trial court appears to have utilized the State's proposed questionnaire, adding an additional question proposed by Dominguez, some ministerial changes, and a cautionary instruction.

also asked if any of the jurors had seen, heard, or read anything about the case, either through media or word of mouth.

As to the second factor, the importance of the missing portion to review the issues raised on appeal, Dominguez emphasizes the significance of juror questionnaires in determining whether there was a fair and impartial jury, pointing to State v. Guevara Diaz, 11 Wn. App. 2d 843, 456 P.3d 869 (2020). In Guevara Diaz, despite answering "no" to the question, "Can you be fair to both sides in a case involving allegations of sexual assault or sexual abuse?", a juror sat on the jury that convicted the defendant. Id. at 846. Although defense counsel requested to interview this prospective juror outside the presence of other jurors during voir dire, the court refused the request. Id. The court held this juror showed actual bias through her response on the questionnaire, and thus violated the defendant's right to a fair and impartial trial. Id. It reasoned the trial court was obligated to oversee the juror selection process, and it failed to do so when "nothing occurred during voir dire to provide any assurance of her impartiality." Id. at 861. See also State v. Irby, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015) (the court has an independent obligation to safeguard the process and prevent biased jurors from being seated). Here, even though there is a complete record of the voir dire questioning, Dominguez claims without the completed questionnaires, he cannot determine whether any prospective jurors responded in a way that showed actual bias, as did the juror in Guevara Diaz, but were not subjected to follow-up questioning to provide an assurance of impartiality.

The report of proceedings shows the following voir dire process. First, the venire was divided into 4 batches of 15, and as to each, the court asked counsel if there were any jurors who needed to be questioned individually. The parties and the court considered the jurors sequentially, discussing whether the questionnaires raised any issues regarding either potential hardship or bias. Based on their questionnaire responses, multiple jurors on the panel were individually questioned about their ability to be fair and impartial.[6]

After identifying jurors for individual questioning and engaging in individual voir dire, the court again attempted to identify anyone in each group who might require individual questioning. For instance, the court asked the first group of 15, jurors 1 through 15, about their ability to be fair and impartial: "Again, we did talk to a number of jurors individually regarding issues on your questionnaire, but are there any of you who feel you cannot be a fair and impartial juror in this case for any reason that we have not already discussed with you? . . . The record shows no response."[7] Dominguez asked similar questions to the second, third, and fourth groups of jurors, and again, for each group, the record shows no juror responded that they could not be fair and impartial.[8]

---

[6] Juror 8 confirmed he could be fair and impartial despite family law enforcement connections. Juror 11 confirmed they could not convict someone if there was any reasonable doubt in their mind. Juror 37 disagreed with the sentiment that if someone reached the trial stage of a charge, they must have done something wrong. Juror 38 emphasized their ability to keep track of their own biases and follow the law as directed. The parties and the court affirmed on the record that jurors 42, 47, and 48 did not have anything on their forms that required further questioning.

[7] But see Guevara Diaz, 11 Wn. App. 2d at 859 & n.45 ("Several courts have pointed out that silence and even answers during group voir dire 'cannot substitute for individual questioning.' ").

[8] Dominguez's counsel asked the second panel if, after "[h]earing a bit more, can anyone think of any reason why they would not be able to be fair and impartial to my client? . . . Anything we haven't covered . . . ? Okay. Thank you very much." He asked the third panel the following question: "And I have a catch-all for everyone here, all right? I just want you to think. You've

On appeal, Dominguez highlights examples in which the trial court and parties occasionally skipped over questionnaires or misread a juror's number and overlooked the hardship answers of some jurors. However, as to each of the jurors Dominguez claims were initially not identified for potential individual questioning, the trial court or one of the parties eventually identified them and then discussed whether individual questioning was needed.

For juror 28, the trial court noted a hardship, and Dominguez also noted individual questioning was needed because they replied that a close family member or friend was assaulted. Similarly, while the trial court initially missed juror 33, Dominguez immediately highlighted that that juror's close family member or friend was assaulted. Likewise, though the court missed juror 38, the State pointed out individual questioning was needed. And though the court initially skipped over juror 44, it immediately realized its error, said it saw no need for individual questioning, and Dominguez agreed.[9]

Dominguez also identifies two instances when neither the court nor either party caught a missed juror response. First, the court noted that juror 2 inquired as to why they were not questioned about their hardship. But the court subsequently did ask the group whether anyone felt they might have a hardship, juror 2 again identified himself, and the court questioned him about his concerns and ultimately excused him. Second, the court also noted that neither party had

___

heard more about this case. Can anyone think of any reasons why they feel like they would not be able to be fair to my client, Jason Dominguez, who's in the Defendant's chair? . . . Okay. Thank you very much." Similarly, he asked the fourth panel, "Can anyone think of any reason that they feel that they would not be able to be fair to my client, Jason Dominguez if you were selected as a juror for a case like this? Okay. Thank you very much."

[9] After discussing juror 45, the court stated, "I skipped over 44. Sorry. I didn't see anything on that one."

asked juror 35 about their potential hardship and that "we may want to ask about that when we bring in the whole group." Subsequently, the State followed up and questioned juror 35 about their hardship. Thus, while Dominguez focuses on the fact that the need to question some jurors was initially overlooked, the record shows that not only did the court or a party identify each such instance, but also each time, follow-up questioning did occur later.

Dominguez also notes that the court jumped from juror 17 to 20 when assessing who needed to be individually questioned. But here too, the fuller record reveals that in context, the gap does not indicate that there were any oversights. This portion of voir dire began with the discussion of the process:

> THE COURT: . . . I thought we could go over who you want to individually question in the next group. . . . Have you had a chance to look at those? Do you have those in front of you?
>
> [DEFENSE COUNSEL]: Yes, your Honor. Give me just a moment.
>
> THE COURT: All right. If we could go to the top. I think we can go through them just sort of as we go here. I'm going to have my law clerk advise Juror No. 2 that we are excusing him for hardship.
>   All right. The first one I saw with any issue was No. 17 has a family member who was sexually abused. No one has checked the box. It seems to be getting missed, but maybe they really don't care. I don't know. But had a member of their family or close friend sexually abused. So, I'm just pointing out each one that might have an issue.
>   Do either one of you want to interview this person individually?
>
> [DEFENSE COUNSEL]: Yes, your Honor.
>
> THE COURT: All right. Any objection, Counsel?
>
> [STATE]: No, your Honor.
>
> THE COURT: 20 said that both themselves and others that they know had been sexually abused. Do you

wish to interview that person individually?

[DEFENSE COUNSEL]: Yes, your Honor.

[STATE]: No objection.

THE COURT: We'll do 20. 20 has indicated a hardship and has indicated a member of the family is sexually abused.

[STATE]: I'm sorry. Are you –

THE COURT: 21, excuse me.

[STATE]: Thank you.

[DEFENSE COUNSEL]: And Defense would request individual voir dire as well.

THE COURT: All right. I'll do 21. So we're doing 17, 20, 21.

As this context shows, the court did not overlook jurors 18 and 19, but rather, no one identified any need to question them. Indeed, though not mentioned by Dominguez, the court also skipped from juror 2 to juror 17, explaining, "The first one I saw with any issue was No. 17 . . . . I'm just pointing out each one that might have an issue." Thereafter, each juror from this group that the court or a party discussed had either a potential hardship or bias and, thus, was identified for further questioning. Moreover, the record shows that the parties did not hesitate to interject to clarify which juror was being discussed, as did the State, or to request individual voir dire, as did Dominguez. Thus, overall, the existing report of the voir dire proceedings shows that the parties and the court worked together to ensure that they identified anyone whose responses to the questionnaire warranted follow-up questioning, whether for hardship or bias.

12

Finally, under factor four, prejudice, the likelihood of prejudice is low. Dominguez points to nothing in the voir dire record that suggests the missing information would support a claim of actual juror bias.[10] While Dominguez does have different counsel on appeal, he is unable to establish that the record is lacking in sufficient completeness to allow appellate counsel to identify issues for appeal. Instead, he provides only speculation that the missing questionnaires remove the opportunity for appellate counsel to review. Additionally, unlike in Tilton and Waits, in which significant portions of the proceedings were not contemporaneously recorded and had to be reconstructed, here, there is a complete verbatim report of the voir dire process. Accordingly, because the existing record is sufficient for appellate review, Dominguez's claim under article I, section 22, fails.

## II.   Admission of Evidence to Show "Lustful Disposition"

At trial, the State moved to admit evidence of Dominguez's Facebook, Snapchat, and text messages, as well as past sexual behavior towards H.S. for the purpose of establishing Dominguez's "lustful disposition" toward her. Defense counsel did not contest the State's motion, and the trial court admitted the evidence without conducting an analysis under ER 404(b). Based on the court's ruling, the parties agreed on a limiting instruction informing the jury that it could consider this evidence "only for the purpose of showing the defendant's 'lustful disposition,' " and that the limitation applied only to the two counts for rape of a child, not the third count of communicating with a minor for immoral purposes.

---

[10] Jurors 1, 8, 11, 13, 18, 19, 23, 29, 37, 38, 42, 47, and 48 were seated.

13

Shortly after Dominguez filed his appeal, the Washington Supreme Court held "lustful disposition" is not a proper basis to admit other-acts evidence. Crossguns, 199 Wn.2d at 285.[11] Dominguez argues the decision in Crossguns mandates a conclusion of error, as the court admitted the evidence only to show his "lustful disposition" and explicitly instructed the jury to consider the evidence for that purpose.

The State argues that Dominguez waived the issue as he failed to object below and does not establish manifest error affecting a constitutional right under RAP 2.5(a). We agree with the State.

Under RAP 2.5(a), the appellate court may refuse to review an error not raised before the trial court. "Appellate courts will not approve a party's failure to object at trial that could identify error which the trial court might correct (through striking the testimony and/or curative jury instruction)." State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007). As an exception, the party may raise a manifest error affecting a constitutional right for the first time on appeal. RAP 2.5(a)(3). For this exception to apply, the appellant must identify a constitutional error and show how the error actually affected their rights at trial. Id. at 926-27. The appellant must make a plausible showing that the asserted error had practical and identifiable consequences in the trial. State v. A.M., 194 Wn.2d 33, 38, 448 P.3d 35 (2019).

---

[11] In Crossguns, the court held that use of the term "lustful disposition" "wrongly suggests that evidence of collateral offenses relating to a specific victim may be admitted for the purpose of showing that the defendant has a propensity for committing sexual misconduct. Therefore, we now reject the 'lustful disposition' label and hold that 'lustful disposition' is not a distinct or proper purpose for admitting evidence." 199 Wn.2d at 285.

Dominguez failed to lodge any objection at trial to the admission of the propensity evidence which the State sought to admit for the purpose of establishing "lustful disposition." Dominguez argues that despite his failure to object, he did not waive any claimed error because he "acted in accordance [with] precedent in effect at the time of the trial," and his trial concluded before the Crossguns decision was issued. He argues that in these circumstances, he did not need to preserve the error. However, despite citing authorities that involve constitutional error,[12] Dominguez does not provide argument explaining how in his case, the claimed error affects a constitutional right.

Nor does the change in law on the use of "lustful disposition" evidence allow Dominguez to bypass the requirements of RAP 2.5(a). "[I]n a narrow class of cases. . . . principles of issue preservation do not apply where the following four conditions are met: (1) a court issues a new controlling constitutional interpretation material to the defendant's case, (2) that interpretation overrules an existing controlling interpretation, (3) the new interpretation applies retroactively to the defendant, and (4) the defendant's trial was completed prior to the new interpretation." State v. Robinson, 171 Wn.2d 292, 305, 253 P.3d 84 (2011). Dominguez fails to explain how Crossguns satisfies the threshold condition of establishing a "new controlling *constitutional* interpretation." (Emphasis added).

---

[12] See Johnson v. United States, 520 U.S. 461, 468, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997) (applying federal waiver rule to allow appeal of issue that involved a judge incorrectly determining a fact instead of submitting it to the jury); State v. Harris, 154 Wn. App. 87, 98, 224 P.3d 830 (2010) (holding defendant's failure to file pre-trial motion to suppress did not waive claim as the U.S. Supreme Court announced a new rule of constitutional procedure); State v. Rodriguez, 65 Wn. App. 409, 417, 828 P.2d 636 (1992) (holding defendant did not waive a seizure issue when Washington's Supreme Court determined art. I, section 7 of Washington Constitution was more protective than federal standards).

This is not one of the "narrow class of cases" to which the <u>Robinson</u> exception to RAP 2.5(a) applies.

Thus, while it is understandable that Dominguez did not object below to the admission of propensity evidence to show "lustful disposition," because at that time this was a proper purpose, he does not establish that the error affects a constitutional right as required under RAP 2.5(a). Therefore, we decline to review his claim that the trial court erred by allowing propensity evidence.

III.     Amended Charges

Dominguez challenges the amendment of charges by the State after it changed the time frame in count I from "on a specific date between or about [a date] through on or about [a date]" to remove the "or about" language—i.e., to read "on a specific date between [a date] and [a date]."[13] He claims because this amendment happened after the State "functionally rested," it violated his rights under article I, section 22 of the Washington Constitution. We disagree.

The initial information charged Dominguez with three counts, including one count of rape of a child in the second degree (count I) and one count of rape of a child in the third degree (count II). The original language in the information for count I stated "on a specific date between or about the 15th day of April, 2017 through on or about the 14th day of April, 2018," the defendant had sexual intercourse with H.S. Based on H.S.'s birthdate, during this period she would have been age 13. Count II contained the same "on or about" language modifying the beginning and end of the date range.

---

[13] Although the State amended similar language in both counts I and II, Dominguez maintained his objection only to count I.

16

Rape of a child in the second degree requires proof that the victim was at least 12 years old but less than 14 years old, RCW 9A.44.076, whereas rape of a child in the third degree requires proof that the victim was at least 14 years old but less than 16 years old. RCW 9A.44.079. At the beginning of trial, Dominguez argued that because there was conflicting evidence about whether H.S. was 13 or 14 years old at the time of the first charged incident, the "on or about" language in the charge left room for the defendant to argue H.S. was 14 at that time, which would prove a lesser degree crime of rape in the third degree.[14] Thus, Dominguez argued for a lesser degree instruction, as the lesser degree crime carried a lower penalty.

Later, during a discussion on jury instructions, the State objected to a lesser degree instruction on count I. The court noted that the "on or about" language in the charge allowed Dominguez to argue the victim was age 14. The State then suggested it could amend the information to remove the "on or about" language, but made no motion at that time. Dominguez objected, arguing that it had been his theory during the trial that H.S. was 14. The trial court postponed ruling, determining it needed to hear further argument first.

The next day, the State presented its last four witnesses. After it did so, the trial court and parties revisited the issue of the lesser degree instruction as well as the State's proposed amendment to the charges. Following extensive argument by the parties, the court allowed the State to amend counts I and II to

---

[14] Rape of a child in the second degree is a Class A felony and requires a life sentence with a lifetime of parole following release. RCW 9A.44.076; RCW 9.94A.507. Rape of a child in the third degree is a Class C felony with a maximum penalty of five years in prison and no more than three years of community custody. RCW 9.94A.701; RCW 9A.44.079.

remove the "on or about" language, so that the charges instead alleged acts "on a specific date between [a date] and [a date]." Dominguez maintained his objection to the change to count I.[15] Based on the amendment, the court denied Dominguez's request for a lesser degree instruction on count I. Immediately after the court's ruling on the amended charges, the State rested.

This court reviews a trial court's ruling on a proposed amendment to an information for abuse of discretion. State v. Brooks, 195 Wn.2d 91, 96, 455 P.3d 1151 (2020). The court abuses its discretion if its decision is manifestly unreasonable or based on untenable reasons. Id. at 97.

Article 1, section 22 of the Washington Constitution provides defendants the right "to demand the nature and cause of the accusation against him." "Pursuant to this right, '[t]he accused . . . has a constitutional right to be apprised of the nature and cause of the accusation against him.' " State v. Gehrke, 193 Wn.2d 1, 6, 434 P.3d 522 (2019) (plurality opinion) (quoting State v. Ackles, 8 Wn. 462, 464-65, 36 P. 597 (1894)). Therefore, the State must allege in the charging document all essential elements of a crime to inform a defendant of the charges against them and to allow for preparation of a defense. Brooks, 195 Wn.2d at 97.

"A criminal charge may not be amended after the State has rested its case-in-chief unless the amendment is to a lesser degree of the same charge or a lesser included offense." State v. Pelkey, 109 Wn.2d 484, 491, 745 P.2d 854 (1987). "Anything else is a violation of the defendant's article I, section 22 right to

---

[15] Also, the amended information erroneously expanded the date range by a year. However, the jury instructions used the original date range.

demand the nature and cause of the accusation against him or her." Id. Under "the Pelkey rule," any amendment from one crime to a different crime after the State has rested is per se prejudicial. State v. Martinez Platero, 17 Wn. App. 2d 716, 721, 487 P.3d 910 (2021) (citing State v. Vangerpen, 125 Wn.2d 782, 791, 888 P.2d 1177 (1995)).

" 'Where the Pelkey rule does not apply, the defendant has the burden of demonstrating prejudice under CrR 2.1(d).' " Brooks, 195 Wn.2d at 98 (quoting State v. Ziegler, 138 Wn. App. 804, 809, 158 P.3d 647 (2007)). CrR 2.1(d) states that "[t]he court may permit any information or bill of particulars to be amended at any time before verdict or finding if substantial rights of the defendant are not prejudiced." CrR 2.1(d) "necessarily operates within the confines of article I, section 22." Pelkey, 109 Wn.2d at 490 (referring to former CrR 2.1(e), now CrR 2.1(d)).

Dominguez first argues that the Pelkey rule applies here and the amended charges were per se prejudicial because the State had "functionally rested," citing Gehrke. In Gehrke, "[a]fter the State called its last witness but before it had formally rested, the prosecutor moved to amend the information" to add a manslaughter charge to the charge of murder in the second degree. 193 Wn.2d at 5. "The State made clear that it intended to rest even if the amendment was not allowed." Id. Defense counsel objected, but the trial court granted the motion to amend, reasoning the defense strategy was "essentially the same" as the defense to the prior charge. Id. This court affirmed, but the Washington Supreme Court reversed. The lead opinion, signed by four justices, held that the Pelkey

rule "is not concerned with whether the State has *formally* rested," but "a trial court cannot allow the 'State to amend the information . . . *after the State has completed presentation of its case in chief.*' " Id. at 9 (quoting Pelkey, 109 Wn.2d at 487). Thus, the lead opinion in Gehrke reasoned, "when the State explicitly states that it will rest its case after moving to amend, it has *functionally rested its case in* chief," and after completing its case in chief, "it may no longer amend," and the Pelkey rule of per se prejudice applied. 193 Wn.2d at 11. Three justices dissented, holding Pelkey outlined a bright line rule so there was no per se prejudice when the State had not formally rested. Id. at 22 (González, J., dissenting). And two justices agreed with the dissent that the Pelkey per se prejudice rule did not apply, but concurred with the lead opinion in result because Gehrke had demonstrated actual prejudice. Id. at 20 (Fairhurst, C.J., concurring).

This court subsequently declined to follow the plurality decision in Gehrke. Martinez Platero, 17 Wn. App. 2d at 723 ("A plurality has little precedential value and is not binding.") (quoting State v. Johnson, 173 Wn.2d 895, 904, 270 P.3d 591)(2012)). Applying the Pelkey "bright line rule," we held that there was no per se prejudice when the State finished examining its witnesses, but before formally resting, moved to amend three counts of rape in the first degree to child molestation in the first degree. Martinez Platero, 17 Wn. App. 2d at 720.

We agree with the reasoning in Martinez Platero that because the "functionally rested" language was supported only by four justices, it is not binding, and, further, "Pelkey remains good law and draws a bright line that per se prejudice does not occur where the State amends the charges to something

20

other than a lesser degree or lesser included offense before the State formally rests." 17 Wn. App. 2d at 723. Thus, here, there is no per se prejudice because the State amended the charges before it formally rested.

In the alternative, Dominguez argues reversal is still required, as the amendment to the information was prejudicial to his substantial rights. In determining prejudice under CrR 2.1(d), this court considers factors such as whether a defendant's ability to defend themselves is jeopardized and whether the amended charge arose out of the same factual scenario. State v. Hakimi, 124 Wn. App. 15, 28, 98 P.3d 809 (2004). Here, Dominguez fails to demonstrate the requisite prejudice from the amendment. First, although the State initially did not make a formal motion to amend, it unequivocally stated it intended to amend the day before it presented its last four witnesses and formally rested. At that point, Dominguez still had an opportunity to cross-examine the four remaining witnesses and to highlight any inconsistencies in the evidence regarding H.S.'s age.

Moreover, an amendment to the time period of a charge does not ordinarily show prejudice if the crime charged remains the same. Brooks, 195 Wn.2d at 99. In Brooks, the defendant was charged with rape of a child in the third degree and child molestation in the third degree. Id. at 95. Both counts included "on or about" language. Id. The court held the defendant was not prejudiced by an expansion of the date range of the alleged crime. Id. at 103. It reasoned:

> "Cases involving amendment of the charging date in an information
> have held that the date is usually not a material element of the

21

crime. Therefore, amendment of the date is a matter of form rather than substance, and should be allowed absent an alibi defense or a showing of other substantial prejudice to the defendant."

Id. at 99 (quoting State v. DeBolt, 61 Wn. App. 58, 61-62, 808 P.2d 794 (1991)). It further reasoned the defendant was on sufficient notice the "charge was alleged flexibly as to the timing of that incident." Id. at 100.

Contrasting Brooks, Dominguez claims the narrowing, as opposed to expansion of the dates in the charges is significant and warrants reversal of count I. He claims he was not on sufficient notice of the charges brought against him because he relied on these flexible dates when forming his trial strategy, which included efforts to cast doubt as to whether H.S. was 13 or 14 years old when the first rape occurred so to establish evidentiary support for a lesser degree instruction. However, Dominguez fails show how he was misled or surprised by the amendment and thus prejudiced, as the charge in count I ultimately remained the same, arose from the same set of facts, and no new charges were added.

Because Dominguez has not shown that his substantial rights were prejudiced by the State's amendment of the time period for count I, the court did not err in allowing the State to amend the charges. Because we determine that no prejudice resulted from the amendment, we need not address whether Dominguez was initially permitted to request the lesser included instruction.

IV.    Comment on the Evidence

Dominguez argues the trial court impermissibly commented on the evidence because the to-convict instructions included the victim's initials, rather

than her name. Dominguez requests this court reject its previous decision in State v. Mansour, which held the use of initials to identify the victim of child molestation in the to-convict instruction did not deprive the defendant of due process or his right to a fair and impartial jury. 14 Wn. App. 2d 323, 470 P.3d 543 (2020). We decline to do so.

The court reviews whether a jury instruction amounts to a judicial comment on the evidence de novo and in the context of the instructions as a whole. State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). Article IV, section 16 of the Washington Constitution provides, "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." This section intends to prohibit a judge "from 'conveying to the jury his or her personal attitudes toward the merits of the case' or instructing a jury that 'matters of fact have been established as a matter of law.' " Levy, 156 Wn.2d at 721 (quoting State v. Becker, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997)).

To determine whether a trial court's statements amount to a comment on the evidence, the court analyzes "the facts and circumstances of the case." State v. Jacobsen, 78 Wn.2d 491, 495, 477 P.2d 1 (1970). The primary concern animating the analysis is whether the description of a fact in a jury instruction "conveys the idea that the fact has been accepted by the court as true." Levy, 156 Wn.2d at 726. The court assumes a comment on the evidence is prejudicial, and the State bears the burden of showing no prejudice occurred. Id. at 723.

In Mansour, we held the use of initials in the to-convict jury instructions did not constitute a comment on the evidence. 14 Wn. App. 2d at 326. There, the

23

court reasoned the name of the alleged victim of child molestation is not a factual issue requiring resolution. Id. at 329. Thus, utilizing initials on a to-convict instruction does not impermissibly convey to the jury that "matters of fact ha[ve] been established as a matter of law." Id. at 329-30. The court also reasoned it is unlikely a jury would presume the party is a victim "—or believe the court considered her one—merely because the court chose to use [the victim's] initials." Id. at 330.

Dominguez also attempts to analogize to State v. Jackman, in which the to-convict instructions included the victims' birthdates as well as their initials. 156 Wn.2d 736, 740-41, 132 P.3d 136 (2006). Though our Supreme Court held the instructions were judicial comments on the evidence, the reason was not the inclusion of the victims' initials, but their birthdates. Id. at 744. Because the charges required proof that the victims were minors, by including their birthdates, the instructions "conveyed the impression that those dates had been proved to be true." Id. But here, unlike the victims' ages in Jackman, H.S.'s name was not an element of the charged crime.

Dominguez additionally relies on federal cases that involved using a pseudonym to bolster his argument that the grant of anonymity conveyed to the jury that the court believed the complaining witness was a crime victim who needed protection. Doe v. Cabrera, 307 F.R.D. 1, 10 (D.D.C. 2014) (a jury may perceive a grant of anonymity as "a subliminal comment on the harm the alleged encounter with the defendant has caused"); James v. Jacobson, 6 F.3d 233, 240-41 (4th Cir. 1993); Doe v. Advanced Textile Corp., 214 F.3d 1058, 1068 (9th Cir.

2000); Doe v. Rose, No. CV-15-07503-MWF-JCx, 2016 WL 9150620 (C.D. Cal. Sept. 22, 2016). The court in Mansour did not find Cabrera and Rose persuasive because those cases concerned maintaining anonymity throughout the entire trial, so the risk of "subliminal comment on the harm" through concealing an identity was more pronounced. 14 Wn. App. 2d at 330. In Mansour, "[b]y contrast, [the victim] was referred to by her full name throughout trial; her identity was not concealed." Id.

We hold that using H.S.'s initials in the to-convict instructions was not an impermissible judicial comment on the evidence. As in Mansour, the initials were not a fact to be proven, and so inclusion of them on the jury instruction did not indicate to the jury a relevant fact was established by law. Nor did the use of initials impermissibly indicate to the jury that H.S. needed to be protected. H.S.'s full name was used at trial, she testified at trial, and no steps were taken to conceal her identity. Thus, any risk that the use of initials indicated harm to H.S. was significantly reduced.

V.     Prosecutorial Misconduct

Dominguez argues the prosecutor engaged in prejudicial misconduct in closing argument necessitating reversal. We disagree.

In closing, Dominguez conceded guilt on the communication charge but contested the rape charges. While acknowledging the messages were inappropriate, Dominguez noted H.S. routinely rejected the advances, arguing nothing sexual occurred in reality. In the alternative, Dominguez argued the State did not prove H.S. was under the age of 14 when the first rape occurred, and

thus the jury should acquit on the charge of rape of child in the second degree. In rebuttal, the prosecutor challenged this argument:

> That doesn't make any sense. Think about it. That's like saying a kid definitely opened a candy wrapper, but don't find that he ate the candy. But then if you do find that he ate the candy, he only ate half of it.

Dominguez contends this commentary was prejudicial misconduct and a misstatement of the law because it invited the jury to convict him on the rape counts based on his concession of guilt on the communication count. The State counters that the analogy was not a call for the jurors to rely on propensity evidence, and even if there was prosecutorial misconduct, it was not so prejudicial that it could not be cured by the accompanying jury instruction.

"Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard." State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014) (quoting State v. Brett, 126 Wn.2d 136, 174-75, 892 P.2d 29 (1995)). The defendant bears the burden of showing the comments were improper and prejudicial. Lindsay, 180 Wn.2d at 430 (citing State v. Warren, 165 Wn.2d 17, 26, 195 P.3d 940 (2008)). "[I]f the defendant fails to object or request a curative instruction at trial, the issue of misconduct is waived unless the conduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Lindsay, 180 Wn.2d at 430 (citing State v. Stenson, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997)). When applying this standard, courts should " 'focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured.' " Lindsay, 180

26

Wn.2d at 444 n.2 (quoting State v. Emery, 174 Wn.2d 741, 762, 278 P.3d 653 (2012)).

As Dominguez did not object to the prosecutor's comment contemporaneously or ask for a curative instruction, he must show the conduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. "In the context of closing arguments, the prosecuting attorney has 'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence." State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009) (quoting State v. Gregory, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006), overruled on other grounds by State v. W.R., 181 Wn.2d 757, 336 P.3d 1134 (2014)). A prosecutor may also argue that evidence does not support the defense theory. State v. Russell, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). But comments on the presumption of innocence are improper if a prosecutor misstates the law in closing argument. Warren, 165 Wn.2d at 27-28 (prosecutor's statements on three separate occasions during closing argument that the defendant did not enjoy the benefit of any reasonable doubt were improper). Nevertheless, "[s]ome improper prosecutorial remarks can touch on a constitutional right but still be curable by a proper instruction." State v. Smith, 144 Wn.2d 665, 679, 30 P.3d 1245 (2001); see also Warren, 165 Wn.2d at 28 (improper statements that defendant did not enjoy benefit of any reasonable doubt were not prejudicial as the trial court provided a thorough curative instruction).

Here, the prosecutor's comments suggested that, because Dominguez admitted that he engaged in improper and inappropriate conversations, there was a heightened likelihood he carried through with escalating the situation at other times as well. Dominguez particularly emphasizes this was the last argument the jury heard before it deliberated, citing a study that indicate such propensity arguments affect defendants negatively.[16] However, the State drew the comparison only once before reaffirming that H.S. did not have an ulterior motive in testifying about the abuse.

Moreover, "[t]he prejudicial effect of a prosecutor's improper comments is not determined by looking at the comments in isolation but by placing the remarks 'in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.' " State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (quoting State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)). Here, in context, the prosecutor's rebuttal argument was in response to perceived inconsistencies in the defense counsel's closing arguments, which conceded that certain facts in evidence and testimony from H.S. were true but argued the accusation of rape was a fabrication. Furthermore, the jury was instructed, "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on the other count." We presume the jury is able to follow instructions. Smith, 144 Wn.2d at 679 ("Some improper prosecutorial remarks can touch on a constitutional right but still be curable by a proper instruction.").

---

[16] Thomas J. Leach, How do Jurors React to 'Propensity' Evidence?—A Report on a Survey, 27 Am. J. Trial Advoc. 559, 572 (2004).

28

We hold that the prosecutor's comments in closing were not so flagrant and ill intentioned that any prejudice was incurable. Thus, the prosecutor's argument based on Dominguez's admitting he engaged in the conduct charged in count III did not constitute reversible error.

VI.     Community Custody Conditions

Dominguez challenges eight of the community custody conditions imposed by the trial court. He argues that each of the challenged conditions is either unconstitutional, unauthorized by law, or not crime-related.

Under RCW 9.94A.703, some conditions are mandatory, some conditions must be either imposed or explicitly waived, and some conditions are within the court's discretion to impose. A court is also permitted to impose "any crime-related prohibitions." RCW 9.94A.703(3)(f). A crime-related condition must be reasonably related to the crime of conviction. State v. Nguyen, 191 Wn.2d 671, 684, 425 P.3d 847 (2018).

On appeal, community custody conditions are reviewed for an abuse of discretion and will be struck when manifestly unreasonable. Id. at 678. A manifestly unreasonable condition is unconstitutional. State v. Bahl, 164 Wn.2d 739, 753, 193 P.3d 678 (2008). Additionally, a trial court cannot impose a community custody condition absent legislative authorization. State v. Warnock, 174 Wn. App. 608, 612, 299 P.3d 1173 (2013).

A. Polygraph Testing (Condition 8)

Condition 8 mandates Dominguez to "[p]articipate in polygraph examinations as directed by the supervising Community Corrections Officer, to

29

ensure conditions of community custody." Dominguez contends that condition 8 is not narrowly tailored to protect his right to refrain from speaking in violation of the First Amendment[17] and violates his Fifth Amendment right against self-incrimination by compelling him to speak.

Community custody conditions that "implicate free speech rights must be narrowly tailored to serve an important government interest and must be reasonably necessary to achieving that interest." State v. K.H.-H., 185 Wn.2d 745, 751, 374 P.3d 1141 (2016). A condition requiring a defendant to submit to polygraph testing is constitutional as a tool to monitor compliance with conditions of community custody and to monitor progress with treatment. State v. Combs, 102 Wn. App. 949, 952, 10 P.3d 1101 (2000). However, polygraph testing may not be used to "discover evidence of other crimes, past or present." Id. at 953 (holding that condition cannot allow for "fishing expeditions" to unearth evidence of other crimes and should have limited polygraph testing only for monitoring progress and compliance with community custody conditions).

Here, condition 8 permits testing only to monitor compliance with other conditions. The State cites to State v. Olsen, in which a urinalysis testing condition was held to be narrowly tailored to monitor compliance with a condition prohibiting the defendant from possessing or consuming alcohol or drugs. 189 Wn.2d 118, 130, 399 P.3d 1141 (2017). The State argues that here, similarly, because it has a compelling interest in protecting the public and promoting and

---

[17] The First Amendment protects both the right to speak and the right not to speak. See Wooley v. Maynard, 430 U.S. 705, 714, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977) (plurality opinion).

monitoring the rehabilitation of the defendant, and condition 8 allows testing to monitor compliance with other conditions, it is constitutional. We agree. Because condition 8 limits administration of polygraphs to the purpose of ensuring compliance with community custody conditions, it is narrowly tailored to serve a compelling interest and is constitutional.

B.  Plethysmograph Testing (Condition 9)

Condition 9 requires Dominguez to "[s]ubmit to plethysmograph testing, as directed by a certified sexual deviancy treatment provider."[18] Dominguez argues that condition 9 impedes his right to privacy in his body and mind and should be stricken or limited to clarify that its intended purpose is to monitor community custody conditions.

In general, a person has a right to privacy under the U.S. and Washington Constitutions. U.S. CONST. amend. IV; WASH. CONST. art. I, § 7.[19] While people do not "forfeit all constitutional protections by reason of their conviction," Bell v. Wolfish, 441 U.S. 520, 545, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979), a person in community custody has a reduced expectation of privacy. Olsen, 189 Wn.2d at 124-25 (explaining that probationers have a lesser expectation of privacy because they have been sentenced to confinement but serve time outside of prison); In re Det. of Herrick, 198 Wn. App. 439, 445, 393 P.3d 879 (2017)

---

[18] Plethysmograph testing " 'involves placing a pressure-sensitive device around a man's penis, presenting him with an array of sexually stimulating images, and determining his level of sexual attraction by measuring minute changes in his erectile responses.' " United States v. Weber, 451 F.3d 552, 554 (9th Cir. 2006) (quoting Jason R. Odeshoo, Of Penology and Perversity: The Use of Penile Plethysmography on Convicted Child Sex Offenders, 14 TEMP. POL. & CIV. RTS. L. REV. 1, 2 (2004)).

[19] Washington provides greater privacy protection than that of the Fourth Amendment by explicitly guaranteeing a person may not be disturbed in their private affairs. See State v. Meneese, 174 Wn.2d 937, 946, 282 P.3d 83 (2012).

(explaining that persons convicted of sex offenses have a reduced privacy interest).

Plethysmograph testing is very intrusive and can be ordered only to provide crime-related "deviancy" treatment, but cannot be used by a community custody officer (CCO) to monitor compliance. State v. Land, 172 Wn. App. 593, 604-05, 295 P.3d 782 (2013) (finding that plethysmograph testing condition was inappropriate because it permitted a CCO to conduct the testing at their discretion). A court imposing plethysmograph testing as a condition of community custody "must make an individualized determination that the testing is necessary." Herrick,198 Wn. App. at 447.

Dominguez cites U.S. v. Weber, 451 F.3d 552, 562-63 (9th Cir. 2006), to argue that the plethysmograph testing is a physical and mental violation of his constitutional right to privacy because it "involv[es] not only a measure of the subject's genitalia but probing of his innermost thoughts as well." . He further argues that the condition must be explained to restrict testing for treatment purposes only.

We agree that plethysmograph testing intrudes upon Dominguez's right to privacy. However, here, the condition is constitutionally permissible because it limits such testing in two ways: only a "sexual deviancy treatment provider" may request plethysmograph testing, and such a request must be for treatment purposes. This provision is constitutionally compliant because under Land, such language sufficiently indicates that the testing is for treatment and not to monitor compliance. 172 Wn. App. at 605.

32

C. <u>Home Inspection and Random Device Searches (Conditions 12 & 21)</u>

Condition 12 requires Dominguez to "consent to DOC home visits to monitor your compliance with supervision. Home visits include access for purposes of visual inspection of all areas of the residence in which you live." Condition 21 permits a CCO "to make random searches of any computer, phone, or computer-related device to which the defendant has access to monitor compliance with this [] condition." Dominguez contends that these two conditions are unconstitutionally overbroad and should be stricken.

All persons have a federally protected right to privacy under both the federal and Washington constitutions. U.S. CONST. amend. IV; WASH. CONST. art. 1, § 7. However, a person under community supervision has a reduced expectation of privacy and can be searched by a CCO when they have reasonable suspicion. <u>State v. Winterstein</u>, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009). Further, a probationer may be subjected to warrantless searches of their property "where there is a nexus between the property searched and the alleged probation violation." <u>State v. Cornwell</u>, 190 Wn.2d 296, 306, 412 P.3d 1265 (2018).

The State asserts that Dominguez's challenge to conditions 12 and 21 is not yet ripe for review because the State has not yet tried to enforce them. On appeal, a defendant can challenge a community custody condition only when it is ripe, meaning " 'the issues raised are primarily legal, do not require further factual development, and the challenged action is final.' " <u>Bahl</u>, 164 Wn.2d at 751 (quoting <u>First United Methodist Church v. Hr'g Exam'r for the Seattle Landmarks</u>

Pres. Bd., 129 Wn.2d 238, 255-56, 916 P.2d 374 (1996)). A reviewing court must also evaluate any hardship the parties may endure if the court declines to consider the claim because it is not ripe. State v. Valencia, 169 Wn.2d 782, 789, 239 P.3d 1059 (2010) (explaining that a condition subjecting a defendant to a search is ripe when "the State attempts to enforce [it] because [its] validity depends on the particular circumstances of the attempted enforcement.").

In support of its argument, the State cites State v. Cates, 183 Wn.2d 531, 535, 354 P.3d 832 (2015). Cates involved a condition similar to the conditions at issue here that required the defendant to consent to home visits to monitor compliance and allowing a CCO to visually inspect all areas of the defendant's residence. Id. at 533. The court explained that there was a need for additional factual development because "[s]ome future misapplication of the community custody condition might violate article I, section 7, but that 'depends on the particular circumstances of the attempted enforcement,' " which would require the State to try to enforce the condition by "requesting and conducting a home visit after [the defendant's] release[]." 183 Wn.2d at 535 (quoting Valencia, 169 Wn.2d at 789).

Here, as in Cates, there is additional factual development that is required, meaning the State must attempt to enforce the home inspection and random device inspection conditions. 183 Wn.2d at 535; see also State v. Holmes, 31 Wn. App. 2d 269, 292-93, 548 P.3d 570 (2024) (following Cates and holding

condition allowing home search was not ripe).[20] Therefore, we hold that Dominguez's claims regarding conditions 12 and 21 are not ripe for review.

    D.   <u>Prohibition on Proximity to Children's Activities (Condition 16)</u>

Condition 16 states that Dominguez must "[s]tay out of areas where children's activities regularly occur or are occurring. This includes parks used for youth activities, schools, daycare facilities, playgrounds . . . church services, restaurants, and any specific location identified in advance by DOC or CCO." Dominguez asserts that condition 16 is unconstitutionally vague in violation of his due process rights and violates his First Amendment right to free exercise of religion.

Both the federal and the state constitutions guarantee all people due process of law. U.S. CONST. amend. XIV, WASH. CONST. art. I, § 3. Due process mandates that all "citizens have fair warning of proscribed conduct." <u>Bahl</u>, 164 Wn.2d at 752. A statute is said to be unconstitutionally vague when a reasonable person would not understand what conduct is proscribed or if it does not have ascertainable standards to safeguard against arbitrary enforcement. <u>State v. Wallmuller</u>, 194 Wn.2d 234, 238-39, 449 P.3d 619 (2019).

First, Dominguez contends that condition 16 is unconstitutionally vague because it fails to explain with "sufficient definiteness" what it means for a location to be one where "children's activities regularly occur." He claims that

---

[20] While we do not reach the merits based on <u>Cates</u>, we note that Division II of this court has held that comparable conditions were overbroad and unconstitutional. <u>State v. Franck</u>, No. 51994-1-II, slip op. at 21-23 (Wash. Ct. App. Feb. 4, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2051994-1-II%20 Unpublished%20Opinion.pdf; <u>State v. Daniels</u>, No. 54094-1-II, slip op. at 12-13 (Wash. Ct. App. Aug. 3, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2054094-1-II%20Unpublished%20Opinion.pdf.

condition 16 expressly listed "restaurants" and "parks used for youth activities" as places that he is not permitted to go, but that he is forced to determine when something is a children's activity and when it regularly occurs,[21] and, therefore, the condition is too vague to tell him what conduct is proscribed.

Our Supreme Court has held that a condition barring the defendant from "loiter[ing] in []or frequent[ing] places where children congregate such as parks, video arcades, campgrounds, and shopping malls," was a "nonexclusive list of 'places where children congregate' " and did not violate due process. Wallmuller, 194 Wn.2d at 237, 245.

Here, like the condition in Wallmuller, condition 16 contains a nonexclusive list that includes places where children may congregate. To safeguard from arbitrary enforcement, the initial sentence of the condition acts as a modifier of the list that follows and instructs Dominguez where he cannot go. See State v. Barragan, No. 80365-4-I, slip op. at 22 (Wash. Ct. App. Nov. 30, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/803654.pdf.[22] Therefore, condition 16 is not unconstitutionally vague because the list of places with the modifying clause sufficiently apprises him of the proscribed conduct.

Dominguez also claims condition 16 functions as a categorical ban on his ability to attend church services, and because there are other less drastic

---

[21] Dominguez also argues that the condition gives his CCO discretion in "setting forbidden locations," which could permit arbitrary enforcement in violation of the vagueness standard.

[22] Though unpublished opinions have no precedential value, we may consider them when "necessary for a reasoned decision." GR 14.1(c). Here, we adopt the reasoning as stated in Barragan, relying on Wallmuller, concluding that the same condition as in this case was not unconstitutionally vague because the first part of the sentence modifies the entire list of places and, thus, sufficiently instructed the defendant as to the locations from which he was prohibited. Barragan, No. 80365-4-I, slip op. at 22.

measures that the court could have imposed, condition 16 violates his First Amendment right and should be stricken. We disagree.

The First Amendment protects a person's right to freely exercise their religion. U.S. CONST. amend. I. However, a state may "restrict an individual's exercise of conduct under a religious belief" when it "ha[s] a compelling interest and the restrictive statute [] ha[s] a 'nexus of necessity' with the asserted state interest." State v. Meacham, 93 Wn.2d 735, 740, 612 P.2d 795 (1980) (quoting State v. Lotze, 92 Wn.2d 52, 57, 593 P.2d 811 (1979) (Abrogated on other grounds by Collier v. City of Tacoma, 121 Wn.2d 737, 854 P.2d 1046 (1993). A constraint on a person's ability to practice their religion must be the least restrictive measure possible. Backlund v. Bd. of Comm'rs of King County Hosp. Dist. 2, 106 Wn.2d 632, 641, 724 P.2d 981 (1986).

Here, the State has a compelling interest in protecting the public and promoting his rehabilitation. A prohibition on going to places where children may be regularly present, including church services, is narrowly tailored to serve that interest. Despite the condition, he is free to practice his religion, including, for example, through remote church services, self-study, or in adult communities. Despite claiming that there are less restrictive measures that the court could have imposed, Dominguez provides no specifics as to what those would be. His claim that condition 16 violates his First Amendment rights is unavailing.[23]

---

[23] The State also argues that Dominguez failed to meet his burden of demonstrating that the condition coercively impacts his ability to practice his religion, citing Barragan, No. 80365-4-I, slip op. at 23. As noted above, Barragan involved a condition similar to condition 16 in this case, and the defendant there "[did] not argue or point to any evidence that the condition has a coercive effect on his practice of religion." Id. However, Barragan provides no useful guidance on this issue because the court concluded that "the question of whether this condition unconstitutionally burdens Barragan's freedom of religion is not squarely before us." Id.

E. Prohibition on Dating and Disclosure of Sex Offender Status (Condition 17)

Condition 17 mandates Dominguez "not date women nor form relationships with families who have minor children, as directed by the supervising [CCO]." Further, condition 17 states that "[s]exual contact in a relationship is prohibited until the treatment provider/CCO approves of such" and requires him to "[d]isclose sex offender status prior to any sexual contact." However, it provides an exception for Dominguez to have sexual contact with his wife absent approval. Dominguez asserts that condition 17 unconstitutionally compels him to speak by forcing him to disclose his status as a sex offender to people with whom he may have sexual contact. He further contends that condition 17 violates his right to marry and to sexual intimacy by prohibiting him from dating absent approval.

A community custody condition barring a defendant from dating or forming relationships with families with minor children is not overbroad or unconstitutionally vague when it is reasonably related to the crime and is necessary to protect the public. State v. Kinzle, 181 Wn. App. 774, 785, 326 P.3d 870 (2014). RCW 9.94A.030(10) defines a crime-related prohibition as one that directly relates to the circumstances of the crime for which the offender has been convicted. There need only be "some basis" of nexus between the crime and the condition. State v. Irwin, 191 Wn. App. 644, 657, 364 P.3d 830 (2015); see also Nguyen, 191 Wn.2d at 684 (explaining there must be a reasonable relationship between the crime of conviction and the condition).

Here, although Dominguez's conviction did not arise from a dating relationship, he was convicted of sexual offenses involving a minor. In Kinzle, the court held that a prohibition on dating women and forming relationships with persons who have minor children was valid because the defendant connected with the minor-victim through a social relationship. 181 Wn. App. at 785. Also, in State v. Autrey, the court approved of a similar prohibition limiting the defendant's ability to date, reasoning it was reasonably related to his crime because "potential romantic partners may be responsible for the safety of live-in or visiting minors." 136 Wn. App. 460, 468, 150 P.3d 580 (2006). Thus, Kinzle and Autrey support the imposition of the condition here because Dominguez's crime was a sexual offense involving a minor, and potential romantic partners may be responsible for minors.

Second, Dominguez argues that condition 17 is not crime-related and compels him to speak in violation of his First Amendment right because it requires him to tell potential sexual partners about his status as a sex offender. But in In re Personal Restraint of Sickels, the court held that a similar condition requiring disclosure of sex offender status was necessary to protect potential sexual partners "by providing them with knowledge of the potential risk [the defendant] presents to minors." 14 Wn. App. 2d 51, 61, 469 P.3d 322 (2020). Similarly, requiring Dominguez to disclose his status as a sex offender is crime-related because his interactions with H.S. were initiated through H.S.'s friendship with Dominguez's daughter and connection with H.S.'s mother through parent organizations. Disclosing his sex offender status protects the public from the risk

he poses to minors. Condition 17 is crime-related and does not violate Dominguez's constitutional rights.

F. Prohibition on Staying in a Residence with a Minor (Condition 18)

Condition 18 prohibits Dominguez from "remain[ing] overnight in a residence where minor children live or are spending the night." Dominguez argues that condition 18 impedes his fundamental right to parent his children because he may be released while his youngest daughter is a minor and the condition prevents him from staying overnight in the same place as a minor.

A crime-related condition impacting person's "fundamental right to the care, custody, and companionship of one's children" is subject to more careful review. In re Pers. Restraint of Rainey, 168 Wn.2d 367, 374, 229 P.3d 686 (2010). Such a condition must be "sensitively imposed" and "narrowly drawn" as to ensure that it is "reasonably necessary to accomplish the essential needs of the State and public order." Warren, 165 Wn.2d at 32, 34. This means there must not be a reasonable alternative means to achieve the State's interest. Id. at 34-35. However, this right can be restricted by a community custody condition if the record supports that it is "reasonably necessary to prevent harm to the children." State v. Ancira, 107 Wn. App. 650, 654, 27 P.3d 1246 (2001) (holding the condition prohibiting the defendant from contacting his children was not reasonably necessary to prevent them from witnessing domestic violence).

Dominguez relies on an unpublished decision, State v. Escobar, in which the trial court had initially failed to consider the impact it would have on the defendant's right to parent his son, so we remanded for the trial court to consider

a condition prohibiting contact with minors. No. 82135-1-I, slip op. at 12-13 (Wash. Ct. App. Jan. 18, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/821351.pdf. Dominguez argues that there is no evidence that his own children are in danger, so a prohibition that would prevent him from living with his minor daughter is not reasonably necessary to prevent harm to her.

In response, the State argues that Dominguez has not demonstrated that he is in fact restricted from communicating with his daughter or making parenting decisions for her.[24] The State further argues that condition 18 is necessary to prevent harm to Dominguez's minor daughter given that he was convicted of "rap[ing] a teenage girl with whom he had a close emotional relationship, akin to that of a father and daughter."

Here, Dominguez informed the court of the possibility of release while his youngest daughter was still a minor. Thus, even if Dominguez will be barred from living under the same roof as her while she is still a minor, the court was made aware of this possibility and considered it, unlike in Escobar, where the record reflected no consideration of the defendant's son. Because the State has a compelling interest in protecting Dominguez's minor daughter given his conviction for rape of a teenage girl with whom he had a close relationship, the condition does not unconstitutionally burden his right to parent.

---

[24] The State also argues that Dominguez has not sufficiently demonstrated that condition 18 will impede his right to parent because he has not shown that his daughter will be a minor upon his release from 170 months of incarceration. Because the precise date of release is unknown, this is not a basis on which to reject Dominguez's claim.

G.   <u>Restrictions on Use of Internet and Computer (Conditions 21 and 24)</u>

Condition 21 bars Dominguez from "access[ing] the Internet on any computer, phone, or computer-related device with access to the Internet or on-line computer service except as necessary for employment purposes [] in any location, unless such access is approved in advance by the supervising [CCO] and your treatment provider." Similarly, condition 24 provides that Dominguez "may not possess or maintain access to a computer, unless specifically authorized . . . [and] may not possess any computer parts . . . including but not limited to hard drives, storage devices, digital cameras, web cams, wireless video devices, [etc.]." Dominguez contends that these restrictions are overbroad because they prohibit constitutionally protected conduct and are not crime-related.

As previously discussed, a crime-related condition is valid when there is some nexus, i.e., a reasonable relation, between it and the crime of conviction. <u>Irwin</u>, 191 Wn. App. at 657. A condition that restricts a defendant's access to the internet is valid if it is "narrowly tailored to the dangers posed by the specific defendant." <u>State v. Johnson</u>, 197 Wn.2d 740, 745-46, 487 P.3d 893 (2021) (holding that an internet condition permitted the defendant to use the internet only with the use of approved filters was not overly broad). Dominguez asserts that although he communicated with H.S. through internet applications there is no evidence that his crimes stemmed from the internet or computers. He further argues that condition 24 is not crime-related because nothing in the record suggests that he used any computer or related devices to perpetrate his crimes

and that this type of condition is more apt for "individuals convicted of possessing or creating child pornography." But Dominguez used internet applications (Snapchat and Facebook) to contact H.S. and send her sexually explicit messages. Dominguez also sent H.S. pornography and asked her to replicate such acts and "sent photographs of his own erect penis to H.S. and asked her to remove her clothes during video chats to expose her breasts." Conditions 21 and 24 are crime-related given that Dominguez's use of technology to commit in the crimes of conviction.

As to his overbreadth argument, Dominguez relies on In re Personal Restraint of Sickels, in which the court accepted the State's concession that a condition similar to condition 21 here was overbroad because it limited internet use only to employment purposes. 14 Wn. App. 2d at 72-74. Here, the State agrees that condition 21 is overbroad and proposes narrower language that would allow Dominguez to use the internet with the appropriate protections that reads, "Do not use or access the World Wide Web unless specifically authorized by your community custody officer through approved filters."[25] We accept the State's concession that condition 21 is overbroad and remand to the trial court to consider the State's proposed language to narrow the condition.

As to condition 24, in other cases considering the same condition, we have previously held that it is overbroad. See State v. Hammerquist, No. 75949-3-I (Wash. Ct. App. Apr. 30 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/759493.PDF; State v. Smith, No. 79454-0-

---

[25] The State's proposed language is based on language that was held not to be overly broad in Johnson, 197 Wn.2d at 744, 746-47.

I (Wash. Ct. App. June 22, 2020) (unpublished),

https://www.courts.wa.gov/opinions/pdf/794540.pdf.[26] We adopt the reasoning in

these opinions and provide the same direction to the trial court on remand:

> In view of the potential impact on recognized free speech rights, the scope and meaning of any limitation on the use of computers must be clarified on remand. Specifically, the sentencing court should clarify (i) the distinction between merely using a computer and possessing or maintaining access to a computer; (ii) what standards apply to the CCO in determining what access to computers is allowed; and (iii) given the ubiquitous presence of computers in our society, if, and why, [the condition] impacts any use or possession of items that include computers with no capacity to store or download images.

Hammerquist, No. 75949-3-I, slip op. at 9-10.[27]

## VII.    VPA and DNA Collection Fee

Dominguez asserts that this court should strike the VPA and DNA

collection fee because he is indigent and recent amendments to the statute bar

courts from imposing such fees on indigent defendants. The State agrees that

the VPA and DNA collection fee should be stricken. In 2023, legislature amended

RCW 7.68.035 to prohibit courts from imposing the VPA when the defendant is

indigent pursuant to RCW 10.01.160(3). The 2023 amendment to RCW 7.68.035

took effect on July 1, 2023. LAWS OF 2023, ch. 449, § 1. Further, the legislature

wholly eliminated the DNA collection fee. LAWS OF 2023, ch. 449, § 4. The 2023

amendments apply to matters pending on direct appeal. State v. Ellis, 27 Wn.

App. 2d 1, 16, 530 P.3d 1048 (2023). Thus, we remand to strike the VPA and

---

[26] We may cite to unpublished opinions if necessary for a reasoned opinion. GR 14.1(c).

[27] We note that in another recent case, the State conceded that this same condition was overbroad. See State v. Reedy, No. 83039-2-I, slip op. (unpublished portion) at 22 (Wash. Ct. App. April 10, 2023), https://www.courts.wa.gov/opinions/pdf/830392.pdf.

DNA collection fee from Dominguez's judgment and sentence.

CONCLUSION

We affirm the convictions for rape of a child in the second degree (count I), rape of a child in the third degree (count II), and communication with a minor for immoral purposes (count III). We additionally affirm the community custody conditions, but remand to replace overbroad language on conditions 21 and 24 and to strike the VPA and the DNA collection fee.

Chung, J.

WE CONCUR:

Brimmer, J.

Dwyer, J.